USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 92-2237 ROBERT B. REICH, SECRETARY OF LABOR, Petitioner, v. SIMPSON, GUMPERTZ & HEGER, INC., AND OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION, Respondents. ____________________ ON PETITION FOR REVIEW OF A DECISION OF THE OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION ____________________ Before Breyer, Chief Judge, ___________ Selya and Stahl, Circuit Judges. ______________ ____________________ Bruce Justh, with whom Marshall J. Breger, Solicitor of Labor, ___________ ___________________ Judith E. Kramer, Deputy Solicitor of Labor, and Joseph M. Woodward, ________________ ___________________ Associate Solicitor for Occupational Safety and Health, were on brief for petitioner. David J. Hatem, with whom Maura A. Greene and Burns & Levinson, _______________ _______________ ________________ were on brief for respondents. Mark A. Casso, Arthur E. Schwartz, Elizabeth A. Davis, Robert C. _____________ __________________ __________________ __________ Gombar, Arthur G. Sapper, and McDermott, Will & Emery on brief for The ______ ________________ _______________________ American Consulting Engineers Council, The National Society of Professional Engineers, and The American Institute of Architects, amici curiae. ____________________ August 20, 1993 ____________________ STAHL, Circuit Judge. In this appeal, the ______________ Secretary of Labor ("the Secretary") challenges a decision of the Occupational Safety and Health Review Commission ("the Commission") granting summary judgment1 in favor of appellee Simpson, Gumpertz & Heger, Inc. ("SGH"). We affirm. I. I. __ Standard of Review Standard of Review __________________ We review the Commission's decision to determine whether its factual findings are supported by substantial evidence in the record, 29 U.S.C. 660(a), and whether its legal conclusions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. 706(2)(A). See also National Eng'g & Contracting ___ ____ _____________________________ Co. v. Occupational Safety & Health Admin., 928 F.2d 762, 767 ___ ___________________________________ (6th Cir. 1991). In making these determinations, we must be mindful "`that an agency's construction of its own regulations is entitled to substantial deference.'" Martin ______ v. Occupational Safety & Health Review Comm'n, 499 U.S. 144, __________________________________________ , 111 S. Ct. 1171, 1175 (1991) (quoting Lyng v. Payne, 476 _ ____ _____ U.S. 926, 939 (1986)). Where the meaning of a regulation is ambiguous, the reviewing court should give effect to the agency's reasonable interpretations, i.e., interpretations which "`sensibly conform[] to the purpose and wording of the ____________________ 1. The Commission's Rules of Procedure incorporate by reference Fed. R. Civ. P. 56. See 29 C.F.R. 2200.61 ___ (1992). -2- 2 regulation[] . . . . '" Id. at , 111 S. Ct. at 1175 ___ _____ (citation omitted) (quoting Northern Indiana Pub. Serv. Co. ________________________________ v. Porter County Chapter of Izaak Walton League of America, __________________________________________________________ Inc., 423 U.S. 12, 15 (1975)). In contrast, no deference is ____ warranted where the agency's interpretation is inconsistent with the wording of the regulation. Id. at , 111 S. Ct. ___ ____ at 1180 ("[W]e emphasize that the reviewing court should defer to the Secretary only if the Secretary's interpretation is reasonable.") (emphasis in original). __ II. II. ___ Factual Background Factual Background __________________ Viewing the record in a light most favorable to the Secretary, we summarize the relevant facts. The events surrounding this litigation arise out of the construction of the Fuller Laboratories Building ("the project") at Worcester Polytechnic Institute ("WPI") in Worcester, Massachusetts. Sometime in 1987, WPI, the owner of the project, hired Payette Associates, Inc. ("Payette"), an architectural firm, to serve as project architect. In June 1987, SGH, an engineering firm located in Arlington, Massachusetts, contracted with Payette to perform certain structural engineering services in connection with the project. The general contractor for the project was Francis Harvey & Sons, Inc. ("Harvey"). -3- 3 The building structure was to consist of five floors of poured concrete placed over a base of steel and temporary metal decking. As general contractor, Harvey was responsible for generating a set of "shop drawings" for the metal decking indicating, inter alia, any shoring necessary _____ ____ to support the decking during the pouring of the concrete. As design engineer, SGH had a duty to review the shop drawings submitted by Harvey for conformance with the project's design concepts and contract specifications.2 On or about July 9, 1988, Harvey submitted the shop drawings of the metal decking to SGH for review. In reviewing those shop drawings, SGH made various notations on the drawings indicating potential trouble spots. One such notation suggested that additional shoring be placed in the area adjacent to the building's elevator shaft. According to the shop drawings, an area on floor 2 of the building was to be composed of metal decking, four and ____________________ 2. With the exception of a few provisions added by the parties, SGH's contract with Payette consisted entirely of the standard form language contained in a document published by the American Institute of Architects. SGH's contract specified, inter alia, that SGH would not be responsible for _____ ____ the "construction means, methods, techniques, sequences or procedures, for safety precautions and programs in connection with the [w]ork . . . ." Rather, the contract assigns those duties to the general contractor: "The [c]ontractor shall supervise and direct the [w]ork, using his best skill and attention. He shall be solely responsible for all construction means, methods, techniques, sequences and procedures and for coordinating all portions of the [w]ork under the [c]ontract." -4- 4 three-quarters inches of concrete, a layer of insulation, and another three inches of concrete topping ("the multi-layered area"). The drawings did not indicate, however, the amount of time that should elapse between the first and second pours of concrete in this area. SGH made no notations or revisions concerning the indicated shoring of the metal decking in the multi-layered area. On December 13, 1988, Harvey's superintendent, Mr. Dwight Mitchell, began pouring the first layer of concrete in the multi-layered area. He planned to pour the first layer of concrete, place the layer of insulation, and pour the second layer of concrete topping in one day. After the first layer of concrete was poured in the multi-layered area, Mitchell noticed that a section of the metal decking in a different area of floor 2 was beginning to sag. Concerned about the amount of deflection, Mitchell telephoned Paul Kelley, SGH's project manager, at Kelley's office in Arlington, Massachusetts. Mitchell informed Kelley of the deflection he had observed and explained his plan for completing the floor that day. When told that the amount of deflection was approximately three-eighths to one-half inch, Kelley stated that that amount of deflection was "normal." Mitchell then mentioned the multi-layered area, and Kelley asked him how he planned to proceed. Mitchell explained that he intended to pour both layers of concrete in -5- 5 one day. According to Mitchell, Kelley "thought for a minute" and told him "I don't see any problem with it . . . ." Mitchell testified that, as a result of this conversation, he "felt assured that it was all safe to just go ahead as we had planned on doing . . . ." At some time after this conversation, Mitchell began pouring the second layer of concrete in the multi- layered area. The metal decking in the multi-layered area, however, was not properly shored and could not support the weight of both layers of wet concrete. As a result, the metal decking in that area collapsed, injuring five workers. Importantly, SGH had no employees at the worksite.3 On March 13, 1989, the Secretary issued a citation to SGH pursuant to 29 C.F.R. 1926.703(a)(1),4 for failure to ____________________ 3. The record reveals that SGH employees visited the construction site on a periodic basis to conduct inspections and attend meetings. 4. 29 C.F.R. 1926.703(a)(1) provides: 1926.703 Requirements for cast-in- 1926.703 Requirements for cast-in- place concrete. place concrete. (a) General requirements for formwork. (1) Formwork shall be designed, fabricated, erected, supported, braced and maintained so that it will be capable of supporting without failure all vertical and lateral loads that may be reasonably anticipated to be applied to the formwork. Formwork which is designed, fabricated, erected, supported, braced and maintained in conformance with -6- 6 shore adequately a lateral load. The Secretary proposed a $1000 penalty for the alleged violation. SGH contested the citation in a letter to the Department of Labor dated April 12, 1989. On June 7, 1989, the Secretary then filed a complaint against SGH before the Commission, requesting that the citation and proposed penalty be affirmed. On September 24, 1990, SGH filed a motion for summary judgment, arguing that the citation should be vacated. On November 27, 1990, the administrative law judge ("ALJ") heard oral argument, and on February 26, 1991, granted the motion and vacated the citation. Subsequently, on April 11, 1991, the Secretary filed a petition for review before the Commission. The Commission heard oral argument on May 28, 1992, and on August 28, 1992, issued a lengthy decision affirming the ALJ. This appeal followed. III. III. ____ Discussion Discussion __________ Congress enacted the Occupational Safety and Health Act of 1970, 29 U.S.C. 651-678 ("OSHA"), to "assure so far as possible every working man and woman in the Nation ____________________ the Appendix to this section will be deemed to meet the requirements of this paragraph. The Secretary also issued a citation to SGH pursuant to 29 C.F.R. 1926.703(a)(2) for failure to have the plans for formwork, including all revisions, available at the jobsite. The Secretary has, however, withdrawn this citation. -7- 7 safe and healthful working conditions and to preserve our human resources[.]" 29 U.S.C. 651(b). To that end, OSHA placed primary responsibility on employers, those individuals who oversee and control the work environment, to achieve compliance with its standards and insure a safe workplace. See S. Rep. No. 1282, 91st Cong., 2d Sess. 9 (1970), ___ reprinted in 1970 U.S.C.C.A.N. 5177, 5186 ("Employers have _________ __ primary control of the work environment and should insure that it is safe and healthful."). Pursuant to OSHA, an employer's duties flow from two sources. First, OSHA imposes a general duty upon each "employer"5 to "furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees[.]" 29 U.S.C. 654(a)(1). Second, OSHA imposes a specific duty upon employers to abide by the occupational safety and health standards promulgated by the Secretary. See 29 U.S.C. ___ 654(a)(2).6 The Secretary has promulgated occupational safety and health standards, otherwise known as "general industry ____________________ 5. As defined in 29 U.S.C. 652(5), an "employer" is "a person engaged in a business affecting commerce who has employees . . . ." 6. 29 U.S.C. 654(a)(2) provides that "[e]ach employer . . . shall comply with occupational safety and health standards promulgated under this chapter." -8- 8 standards." See 29 C.F.R. Part 1910 (1992). The Secretary ___ has also enacted industry-specific standards, which, as authorized by the Act, see 29 U.S.C. 652(10), are borrowed ___ from previously enacted federal statutes and regulations. 29 C.F.R. 1910.12-.16 (1992). Indeed, shortly after the Act became effective, the Secretary summarily adopted a group of federal standards for the construction industry that had previously been promulgated under the Construction Safety Act of 1969, 40 U.S.C. 333. See 29 C.F.R. Part 1926 (1992). 29 C.F.R. ___ 1910.12(a) defines the regulatory universe to which these construction standards apply: The [Construction Safety Act] standards prescribed in part 1926 of this chapter are adopted as occupational safety and health standards under section 6 of Act and shall apply, according to the provisions thereof, to every employment and place of employment of every employee engaged in construction work. Each employer shall protect the employment and places of employment of each of his employees engaged in construction work by complying with the appropriate standards prescribed in this paragraph. In the proceedings below, the parties characterized the dispositive issue in the case as whether SGH's employees were engaged in "construction work" as defined by the regulation.7 Relying upon previous Commission precedent, ____________________ 7. The phrase "construction work" is defined as "work for construction, alteration, and/or repair, including painting and decorating." 29 C.F.R. 1910.12(b). -9- 9 see Skidmore, Owings & Merrill, 5 BNA OSHC 1762 (1977), the ___ ___________________________ Commission held that design professionals could only be found liable under Part 1926 to the extent that they exercise "substantial supervision" over the "actual construction." The Commission found that SGH's actions could not, even when viewed in a light most favorable to the Secretary, constitute "substantial supervision." It therefore affirmed the ALJ's decision to grant SGH's motion for summary judgment. After carefully reviewing the record, we agree that SGH was entitled to summary judgment. However, we base our conclusion on grounds different than those relied upon below. See Resare v. Raytheon Co., 981 F.2d 32, 44-45 n.30 (1st Cir. ___ ______ ____________ 1992) (noting that we are free to affirm decision below "`on any ground supported in the record even if the issue was not pleaded, tried or otherwise referred to in the proceedings below'") (quoting Chamberlin v. 101 Realty, Inc., 915 F.2d __________ ________________ 777, 783 n.8 (1st Cir. 1990)). The Secretary maintains that SGH can be found liable under Part 1926 even though it had no employees at the __ construction site. In light of the plain meaning of 29 C.F.R. 1910.12(a), we find such an interpretation unreasonable. Section 1910.12(a) requires "each employer" to "protect the employment and places of employment of each of ______ __ __________ __ ____ __ ____________________ -10- 10 his employees . . . ." (emphasis added). The dispositive ___ _________ question, in our opinion, is whether the construction site at WPI was a "place[] of employment" which SGH had a duty under OSHA to protect. The record reveals that SGH employees were not on the jobsite on a daily or even weekly basis. SGH did not have an office or a trailer at the site. On the date of the accident, there were no SGH employees on the site, and when the conversation took place between Kelley and Mitchell on that morning, Kelley was at his office in Arlington, Massachusetts. Under these circumstances, we do not think that the WPI construction site is a "place[] of employment" which SGH had a duty under OSHA to protect.8 In our opinion, adoption of the Secretary's interpretation would expand the meaning of the phrase "places of employment" beyond any reasonable boundaries. For example, suppose that a construction equipment leasing company sends an employee to the site to inspect or perform maintenance upon a piece of its leased equipment, and that the employee gives gratuitous advice to the user of the equipment which allegedly causes an on-site accident. Under the Secretary's interpretation, the leasing company could be ____________________ 8. We should make perfectly clear that SGH might well have breached some other legal duty in assuring Harvey's crew that it was safe to pour the concrete. We express no view on this point. Our holding, rather, is a narrow one: that OSHA regulation 29 C.F.R. 1910.12(a), did not require SGH to maintain a safe construction site at WPI. -11- 11 liable under an OSHA provision directing that it provide a safe working environment for its own employees. Simply put, ___ ___ we cannot, given the plain language of the regulation and the dictates ofcommonsense,acceptsuchanexpansivenotionofliability.9 Finally, we have not found, nor has the Secretary cited, any cases supporting the Secretary's interpretation of the phrase "places of employment." Indeed, in every case cited by the Secretary, the employer had employees at the actual construction site. Providing as much deference as possible to the Secretary's interpretation, we still do not see how one could reasonably read the Department's regulation as he has done. If the Secretary believes broader liability is appropriate, the solution is simply to amend the regulation so that it includes places where the employer's own employees have never worked--assuming, of course, he has the authority to do so under OSHA (a matter on which we express no view). It is not to ignore the regulation's present, more restrictive, language. The Commission's decision is affirmed. affirmed ________ ____________________ 9. We also note that the Secretary's interpretation might have the perverse result of causing an employer to discourage his/her employees from making on-site safety inspections for fear of being subjected to OSHA liability. -12- 12