<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 UNITED STATES COURT OF APPEALS
                     FOR THE FIRST CIRCUIT
                      ____________________

No. 97-1392

                     EMPIRE COMPANY, INC.,
                          Petitioner,

                               v.

        OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION
                  AND THE SECRETARY OF LABOR,
                          Respondents.

                      ____________________

           ON PETITION FOR REVIEW OF A FINAL ORDER OF
      THE OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION

                      ____________________

                             Before

                    Torruella, Chief Judge,

                     Boudin, Circuit Judge,

and Woodlock, District Judge.

                     _____________________

   Jay A. Garca-Gregory, with whom Luis A. Oliver-Fraticelli and
Fiddler, Gonzlez & Rodrguez were on brief for petitioner.
   Terri Parker DeLeon, Attorney, U.S. Department of Labor,
Office of the Solicitor-Occupational Safety and Health, with whom
J. Davitt McAteer, Acting Solicitor of Labor, Joseph M. Woodward,
Associate Solicitor for Occupational Safety and Health, and
Bruce F. Justh, Assistant Counsel for Appellate Litigation were on
brief for respondents.

                      ____________________

                        March 16, 1998
                     ____________________

        WOODLOCK, District Judge.  In this appeal, petitioner
Empire Co. ("Empire") challenges a decision of the Occupational
Safety and Health Review Commission (the "Commission") affirming  
citations issued by the Secretary of Labor (the "Secretary") for
violations of the Occupational Safety and Health Act of 1970, 19
U.S.C.  651-678 (the "Act").  Empire maintains that its worksite
in Ponce, Puerto Rico is outside the enforcement jurisdiction of
the Occupational Safety and Health Administration of the United
States Department of Labor ("OSHA") because the area does not fall
within the scope of OSHA's marine terminal standard, 29 C.F.R. Part
1917.  We find that the Commission could properly find the worksite
within that standard and accordingly affirm.
                     I.  Standard of Review
        At the outset, it is important to delineate the standards
which govern our evaluation.  We review the Commission's legal
conclusions to determine whether they are arbitrary, capricious, an
abuse of discretion, or otherwise not in accordance with law.  See
P. Gioioso & Sons, Inc. v. Occupational Safety & Health Review
Comm'n, 115 F.3d 100, 107-08 (1st Cir. 1997) (citing 5 U.S.C.  706
(2)(A)); Reich v. Simpson, Gumpertz & Heger, Inc., 3 F.3d 1, 2 (1st
Cir. 1993).  "In making these determinations we must be mindful
that an agency's construction of its own regulations is entitled to
substantial deference."  Reich, 3 F.3d at 2; see P. Gioioso, 115
F.3d at 107.  Thus, the agency's interpretation must be given
effect if it is reasonable--that is to say, if it sensibly conforms
to the purpose and wording of the regulation.  See P. Gioioso, 115
F.3d at 107; Reich, 3 F.3d at 2.  Where the Secretary and the
Commission advance reasonable but differing interpretations of an
ambiguous regulation, the Secretary's interpretation is to be given
effect.  See Martin v. Occupational Safety & Health Review Comm'n,
499 U.S. 144 (1991).
        We review the Commission's factual findings to determine
whether they are supported by substantial evidence in the record
considered as a whole.  See P. Gioioso, 115 F.3d at 108 (citing 29
U.S.C.  660(a)); Reich, 3 F.3d at 2.  "[T]he standard applies with
undiminished force where, as here, an administrative body, like the
commission, does not itself hear witnesses but instead adopts an
ALJ's findings of fact."  P. Gioioso, 115 F.3d at 108 (citing Truck
Drivers & Helpers Union, Local No. 170 v. NLRB, 993 F.2d 990, 998-
99 (1st Cir. 1993)).
                    II.  Factual Background
        The findings of fact made by the administrative law
judge, upheld by the Commission on review and supported by
substantial evidence in the record as a whole established as
follows.  Empire operates a worksite in Ponce, Puerto Rico, where
it engages in the maintenance, repair, and rental of equipment such
as marine shipping containers, lifts to move heavy loads and
chassis upon which containers are placed for ground transportation.  
Clients in the maritime industry provide approximately eighty
percent of Empire's rental business and approximately eighty-five
percent of its maintenance and repair business.  Empire also
supplies diesel fuel to Luis Ayala Coln Successors Inc. ("LAC"),
a stevedoring company, and to the Ponce Port Authority, which
operates a wharf and berth facility for the handling of maritime
cargo.
        Empire's worksite, as illustrated in two hand-drawn maps
made a part of the administrative record and attached as Appendices
A and B to this opinion, lies approximately one-half mile north of
the Port Authority's wharves.  A public road, P.R. 10, runs roughly
east and west along the wharf.  The road is fenced on both sides,
and access to the wharf is provided through a gate.  Railroad
tracks run roughly north from the shore, intersecting P.R. 10 then
veering westward before reaching Empire's worksite.  A railroad
loading facility, operated by CHEMEX Corp., lies between Empire's
worksite and the shore.  To the east of the CHEMEX facility are
unrelated structures, including a boat yard, a warehouse, a gas
storage facility, and a tuna factory.  To the west are offices of
the Port Authority, and an area in which shipping containers were
being stored at the time of the OSHA inspection.
                    III.  Procedural History
        On June 12, 1993, the Secretary issued two citations to
Empire for violations of the Act.  Empire contested the citations,
claiming that its worksite does not fall within the scope of OSHA's
marine terminal standard, 29 C.F.R. Part 1917.  The Act permits
states to enforce occupational safety and health standards under
plans approved by the Secretary.  See 29 U.S.C.  667.  Puerto Rico
operates generally under such an approved plan.  See 29 C.F.R.
1952.383(s); 47 Fed. Reg. 39,164-66 (1982).  As a result, OSHA
has enforcement jurisdiction in Puerto Rico only over marine
terminals, 29 C.F.R. Part 1917, and in other narrow areas not
relevant here.
See 29 C.F.R.  1952.382.
        The marine terminal standard applies to
          employment within a marine terminal as
          defined in  1917.2(u), including the
          loading, unloading, movement or other
          handling of cargo, ship's stores or gear
          within the terminal or into or out of any
          land carrier, holding or consolidation
          area, or any other activity within and
          associated with the overall operation and
          functions of the terminal, such as the use
          and routine maintenance of facilities and
          equipment.

29 C.F.R.  1917.1(a).

        "Marine terminal" means

          wharves, bulkheads, quays, piers, docks
          and other berthing locations and adjacent
          storage or contiguous areas and structures
          associated with the primary movements of
          cargo or materials from vessel to shore or
          shore to vessel including structures which
          are devoted to receiving, handling,
          holding, consolidation and loading or
          delivery of waterborne shipments or
          passengers, including areas devoted to the
          maintenance of the terminal or equipment.  
          The term does not include production or
          manufacturing areas having their own
          docking facilities and located at a marine
          terminal nor does the term include storage
          facilities directly associated with those
          production or manufacturing areas.

Id.  1917.2(u).

        After a hearing, an administrative law judge (the "ALJ")
held that Empire's worksite was within the scope of Part 1917 and
therefore was within OSHA's enforcement jurisdiction.  The ALJ
viewed part 1917 as imposing both a functional test and a
geographic test for determining whether the marine terminal
standard applies to a given worksite.
        The ALJ found the functional test satisfied because
Empire engaged in "the . . . maintenance of . . . equipment" used
in maritime cargo handling, and because Empire's sales of diesel
fuel to the Ponce Port authority and LAC were activities
"associated with the overall operation and functions of the
terminal."
        The ALJ found the geographic test satisfied because
Empire's operations took place in "contiguous areas . . . devoted
to the maintenance of the terminal or equipment."  He saw no need
to look beyond what he characterized by reference to Webster's
Third New International Dictionary as the plain meaning of
"contiguous," which he interpreted as "nearby" or "close" and not
limited to immediately or directly adjoining locations.  He
determined "that the presence of a road, fences, and gate along the
wharf is not sufficient to separate out the premises to the north
and prevent them from being considered part of a marine terminal."  
The ALJ also found that neither the Port Authority offices to the
west nor the unrelated structures to the east "intrude into or
occupy any part of the area to the south between Empire's facility
and the wharf itself."  Consequently, the Empire worksite was
determined to  be contiguous with the wharf: "Since there are no
intervening work operations or structures unrelated to marine
terminal activities, the evidence supports a finding that Empire's
property is part of a single, overall facility which comes within
the definition of a marine terminal."
        Empire filed a petition for review of this decision, and
the Commission affirmed but used a different interpretation.  
Specifically, with respect to the functional test, the Commission
found reasonable an administrative interpretation under which "a
contiguous area is considered a marine terminal without regard to
whether it is associated with the primary movement of cargo or
materials from vessel to shore or shore to vessel."  With respect
to the geographic test, the Commission agreed with the ALJ that
"contiguous," as used in  1917.2(u), can mean "nearby."  The
Commission found that, under this definition, Empire's facility
qualifies as a contiguous area because it is located approximately
one-half mile from the wharf and because "[a]ll of the property
between Empire and the wharf is devoted to maritime activities."
        Pursuant to 29 U.S.C.  660, Empire petitioned this Court
for review.
                IV.  Defining "Marine Terminal"
        Empire challenges (A) the Commission's interpretation of
the functional test, (B) the Commission's interpretation of the
geographic test, and (C) the Commission's application of the
geographic test to Empire's worksite.
        A.  The Functional Dimension of "Marine Terminal":
            Maintenance Associated with Cargo Movement  

        By holding that a contiguous area is considered a marine
terminal without regard to whether it is associated with the
primary movement of cargo or materials from vessel to shore or
shore to vessel, the Commission all but did away with a function
dimension to the term "marine terminal."  Adopting that
interpretation, the Commission considered only whether Empire's
worksite is contiguous to the Ponce wharf.
        We find this aspect of the interpretation articulated by
the Commission contrary to the plain language of the regulation.  
Section 1917.2(u) deals with two basic categories of sites.  First
are those sites that are per se elements of a marine terminal:
"wharves, bulkheads, quays, piers, docks and other berthing
locations and adjacent storage . . . ."  The second category,
introduced in  1917.2(u) by the disjunctive "or," are those
"contiguous areas and structures" serving functions "associated
with the primary movement of cargo or materials from vessel to
shore or shore to vessel . . . including areas devoted to the
maintenance of the terminal or equipment."  The Commission could
have reached its interpretation only by finding that the
"associated with" language modifies "structures" but not
"contiguous areas."  Under the open-textured interpretation adopted
by the Commission, any contiguous area would qualify as part of a
marine terminal without apparent regard for its function.  If this
interpretation were correct, however, it would be supererogatory
for the regulation to provide that a marine terminal "includ[es]
areas [not limited to structures] devoted to the maintenance of the
terminal or equipment."  This offends a basic canon of statutory
construction requiring every portion of the regulatory language to
have meaning.  See Connecticut Nat'l Bank v. Germain, 503 U.S. 249,
253 (1992).  Furthermore, by making Part 1917 applicable to
contiguous areas without regard to the activities performed
therein, the Commission's interpretation cuts the marine terminal
standard loose from certain articulated purposes identified by the
agency in promulgating its standard.  "This proposed rule is a
vertical standard, i.e., one which applies to this industry
exclusively and is designed specifically to address the hazards
associated with marine cargo-handling shore."  46 Fed. Reg. 4182,
4182 (1981).
        We interpret  1917.2(u) with emphasis on its functional
purpose.  We see that purpose to be furthered by finding that
Empire's worksite is part of a marine terminal precisely because,
as a marine equipment maintenance area, it is associated with the
primary movement of cargo or materials.  In this connection, Empire
contends that the marine terminal standard was not intended to
apply to worksites where employees are "merely" engaged in the
maintenance and repair of equipment.  This argument strains to
avoid a practical recognition of just what happens at a marine
terminal.  The Supreme Court has observed--albeit in the context of
the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.
901-950--that "maintaining or repairing equipment essential to
the loading or unloading process" is not only associated with
primary marine activity, but "is an integral part of and essential
to those overall processes."  Chesapeake & Ohio Ry. Co. v. Schwalb, 493 U.S. 40, 47 (1989).  Furthermore, Empire's suggested
definition of a marine terminal permits disregard of one of the
important specific goals of the regulation: to prevent injuries
suffered during "hot  work" (e.g., welding, cutting, heating),
which "is used in the marine terminal principally to perform
routine maintenance and repair tasks, such as rebuilding a damaged
intermodal container or repairing a chassis that is no longer
properly aligned." 46 Fed. Reg. 4182, 4221 (1981).  This is
activity the ALJ found to be present at Empire's worksite.  Most
importantly, the regulation itself plainly states that areas
covered by virtue of function include those "devoted to the
maintenance of the terminal or equipment."
        The ALJ found, and Empire does not dispute, that
"Empire's business at the location in question is maintenance and
repair of equipment used in marine terminal operations."  Although
the Commission's expansive interpretation avoided any need to
review that determination, it is clear to us that this finding of
fact is the only one supported by the administrative record.  As a
result, remand to the Commission would serve no purpose and is
therefore inappropriate.  See, e.g., Brock v. L. R. Willson & Sons,
Inc., 773 F.2d 1377, 1389 n.12 (D.C. Cir. 1985); Marshall v. Western Elec., Inc., 565 F.2d 240, 246 (2d Cir. 1977), overruled on
other grounds, Martin v. Occupational Safety & Health Review
Comm'n, 499 U.S. 144 (1991).
        In sum, while we find the Commission's interpretation of
the functional test to be erroneous, we nevertheless conclude that
Empire's worksite indisputably satisfies the appropriately tailored
functional test applied by the ALJ.
        B.  The Geographic Dimension: "Contiguous" Areas
        Empire challenges the interpretation of "contiguous" as
including areas "nearby" but not necessarily "touching."  The
dictionary definition relied upon by the ALJ and the Commission
lists "touching along boundaries" as the primary definition and
"nearby" as the tertiary--and therefore less commonly used--
meaning.  As the Supreme Court has emphasized in an analogous
context, an agency's interpretation need not comport with the most
common usage:
            To be sure, "terminate" may also bear
          the meaning proposed by respondent.  
          Indeed, it may bear that meaning more
          naturally or more frequently in common
          usage.  But it is axiomatic that the
          EEOC's interpretation of Title VII, for
          which it has primary enforcement
          responsibility, need not be the best one
          by grammatical or any other standards.  
          Rather, the EEOC's interpretation of
          ambiguous language need only be reasonable
          to be entitled to deference.

EEOC v. Commercial Office Prods. Co., 486 U.S. 107, 115 (1988).  
The language of  1917.2(u) does not clearly preclude "nearby," and
we therefore consider whether the definition adopted by the
Commission and the ALJ, regardless of its rank in the dictionaries,
is a reasonable interpretation of the term "contiguous" as used in
Part 1917.
        In promulgating Part 1917, OSHA explained why regulations
were needed in certain geographic areas: "The work environment at
a marine terminal exposes maritime employees to a greater risk of
injury than is true for workers in most other industries."  46 Fed.
Reg. 4182, 4183 (1981).  Of course, many of the hazards covered by
Part 1917 are plainly greatest at the wharves and piers themselves.  
It is undisputed, however, that Part 1917 applies to some areas
distinct from the docks, so long as related activities are carried
out therein.  The Secretary has simply determined that, under the
regulations, the degree of danger--and thus the need for coverage--
in such a distinct area with such defined activities depends upon
its proximity to the wharf rather than upon whether the two areas
share a common border.
        If we were not according substantial deference to the
agency interpretation, we might be tempted to read Part 1917 to
apply only to those areas immediately adjacent to the wharf itself,
because the hazards of direct cargo handling are most likely to be
experienced in such areas and because that is a more rigorous
definition of "contiguous."  Cf. Bryan A. Garner, A Dictionary of
Modern Legal Usage 213 (2d ed. 1995) ("contiguous means, not merely
'close to' or 'near,' but 'adjacent'").  The farther activities are
from adjacent areas of direct cargo handling, the more remote are
the unique dangers of marine terminals.  Presumably at some point
beyond adjacent areas employees may appropriately be protected by
the ordinary safety standards of a given locality.  But these
generalizations are speculative, and by contrast we note the ALJ's
finding that the actual working activities at Empire's worksite
involve the types of hazards addressed by the marine terminal
standard--e.g., welding, electrical safety, hazard communications,
fall protection, and machine guarding.  In any event, the parties
have failed to describe the practical significance of the choice
between the OSHA and the Puerto Rico safety regimes.  In light of
the regulation's general protective purposes--and in the absence of
some demonstration that an expansive reading presents a practical
anomaly--we do not find it unreasonable to interpret Part 1917 as
applying to areas "nearby"-- and not just to those "touching"--the
wharf. Cf. Texports Stevedore Co. v. Winchester, 632 F.2d 504, 514
(5th Cir. 1980) (holding that areas "adjoining" navigable waters,
which are covered by the Longshoremen's and Harbor Workers'
Compensation Act, include areas "close to or in the vicinity of
navigable waters").
        C.  Application of the Geographic Test  
        The Commission's determination of contiguity was based in
part upon findings that Empire's worksite and the wharf are
separated by an area, about one-half mile long, entirely devoted to
maritime activity.  This factual predicate was supported by
substantial evidence in the record as a whole.  Although Empire
contends that an "empty lot" lay to the south, directly adjacent to
the CHEMEX facility, two OSHA officers testified at the hearing
before the ALJ that they had personally observed chassis and
containers in this area.  Similarly, the maps introduced by both
parties in the administrative proceeding, see supra note 1 and
accompanying text, together with the related testimony,
demonstrated, as the ALJ found, that neither the unrelated
structures to the east nor the Port Authority offices to the west
"intrude into or occupy any part of the area to the south between
Empire's facility and the wharf itself."
        We also agree with the ALJ that "the presence of a road,
fences, and gate along the wharf is not sufficient to separate out
the premises to the north and prevent them from being considered
part of a marine terminal."  Empire makes much of an OSHA guideline
emphasizing that federal enforcement jurisdiction ends at "the gate
of the terminal."  OSHA Instruction STP 2-1.112 (Sept. 9, 1983).  
However, this phrase appears merely to be a figurative reference to
the geographic limits on the scope of Part 1917, and in any event
it does not answer the question of where the terminal begins or
ends.  The marine terminal standard undoubtedly applies to areas
distinct from the wharf itself.  The existence of intervening
roads, fences, and gates between such areas is entirely
unremarkable, and such appurtenances do not necessarily reduce the
dangers to which the marine terminal standard is addressed.
                         V.  Conclusion
        We conclude Part 1917 can properly be interpreted to
cover maintenance areas "nearby" a wharf, associated with the
primary movement of cargo.  We further conclude the Commission's
finding that Empire's worksite is covered by Part 1917 is in
accordance with that interpretation and is supported by substantial
evidence in the record as a whole.  Accordingly we will not disturb
the Commission's ultimate conclusion that Empire's worksite is a
"marine terminal" subject to 29 C.F.R. Part 1917.
        Affirmed.

</body>

</html>