**EMPIRE COMPANY, INC., Petitioner,**

v.

**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and the Secretary of Labor, Respondents.**

No. 97–1392.

United States Court of Appeals, First Circuit.

Heard Oct. 10, 1997.

Decided March 16, 1998.

Jay A. García–Gregory, with whom Luis A. Oliver–Fraticelli and Fiddler, González & Rodriguez were on brief for petitioner.

Terri Parker DeLeon, Attorney, U.S. Department of Labor, Office of the Solicitor–Occupational Safety and Health, with whom J. Davitt McAteer, Acting Solicitor of Labor, Joseph M. Woodward, Associate Solicitor for Occupational Safety and Health, and Bruce F. Justh, Assistant Counsel for Appellate Litigation were on brief for respondents.

Before TORRUELLA, Chief Judge, BOUDIN, Circuit Judge, and WOODLOCK,* District Judge.

WOODLOCK, District Judge.

In this appeal, petitioner Empire Co. ("Empire") challenges a decision of the Occupational Safety and Health Review Commission (the "Commission") affirming citations issued by the Secretary of Labor (the "Secretary") for violations of the Occupational Safety and Health Act of 1970, 29 U.S.C. §§ 651–678 (the "Act"). Empire maintains that its worksite in Ponce, Puerto Rico is outside the enforcement jurisdiction of the Occupational Safety and Health Administration of the United States Department of Labor ("OSHA") because the area does not fall within the scope of OSHA's marine terminal

---

* Of the District of Massachusetts, sitting by designation.

standard, 29 C.F.R. Part 1917. We find that the. Commission could properly find the worksite within that standard and accordingly affirm.

## I. Standard of Review

At the outset, it is important to delineate the standards which govern our evaluation. We review the Commission's legal conclusions to determine whether they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See P. Gioioso & Sons, Inc. v. Occupational Safety & Health Review Comm'n*, 115 F.3d 100, 107–08 (1st Cir.1997) (citing 5 U.S.C. § 706(2)(A)); *Reich v. Simpson, Gumpertz & Heger, Inc.*, 3 F.3d 1, 2 (1st Cir.1993). "In making these determinations we must be mindful that an agency's construction of its own regulations is entitled to substantial deference." *Reich*, 3 F.3d at 2; *see P. Gioioso*, 115 F.3d at 107. Thus, the agency's interpretation must be given effect if it is reasonable—that is to say, if it sensibly conforms to the purpose and wording of the regulation. *See P. Gioioso*, 115 F.3d at 107; *Reich*, 3 F.3d at 2. Where the Secretary and the Commission advance reasonable but differing interpretations of an ambiguous regulation, the Secretary's interpretation is to be given effect. *See Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991).

We review the Commission's factual findings to determine whether they are supported by substantial evidence in the record considered as a whole. *See P. Gioioso*, 115 F.3d at 108 (citing 29 U.S.C. § 660(a)); *Reich*, 3 F.3d at 2. "[T]he standard applies with undiminished force where, as here, an administrative body, like the commission, does not itself hear witnesses but instead adopts an ALJ's findings of fact." *P. Gioioso*, 115 F.3d at 108 (citing *Truck Drivers & Helpers Union, Local No. 170 v. NLRB*, 993 F.2d 990, 998–99 (1st Cir.1993)).

## II. Factual Background

The findings of fact made by the administrative law judge, upheld by the Commission on review and supported by substantial evidence in the record as a whole established as follows. Empire operates a worksite in Ponce, Puerto Rico, where it engages in the maintenance, repair, and rental of equipment such as marine shipping containers, lifts to move heavy loads and chassis upon which containers are placed for ground transportation. Clients in the maritime industry provide approximately eighty percent of Empire's rental business and approximately eighty-five percent of its maintenance and repair business. Empire also supplies diesel fuel to Luis Ayala Colón Successors Inc. ("LAC"), a stevedoring company, and to the Ponce Port Authority, which operates a wharf and berth facility for the handling of maritime cargo.

Empire's worksite, as illustrated in two hand-drawn maps made a part of the administrative record and attached to this opinion,[1] lies approximately one-half mile north of the Port Authority's wharves. A public road, P.R. 10, runs roughly east and west along the wharf. The road is fenced on both sides, and access to the wharf is provided through a gate. Railroad tracks run roughly north from the shore, intersecting P.R. 10 then veering westward before reaching Empire's worksite. A railroad loading facility, operated by CHEMEX Corp., lies between Empire's worksite and the shore. To the east of the CHEMEX facility are unrelated structures, including a boat yard, a warehouse, a gas storage facility, and a tuna factory. To the west are offices of the Port Authority, and an area in which shipping containers were being stored at the time of the OSHA inspection.

## III. Procedural History

On June 12, 1993, the Secretary issued two citations to Empire for violations of the Act.

---

1. We recognize the hazards of reliance in judicial opinions upon potentially misleading graphic images. *See generally* Hampton Dellinger, *Words are Enough: The Troublesome Use of Photographs, Maps, and Other Images in Supreme Court Opinions*, 110 Harv.L.Rev. 1704 (1997). The crudely prepared maps here, for example, neither of which is drawn to scale, were offered respectively by Empire (Bates No. 00013) and by the Secretary (Bates No. 00098) apparently to emphasize their partisan contentions about the site. Nevertheless, viewed with caution, they may be helpful as supplements to the narrative above in imagining the locale.

Empire contested the citations, claiming that its worksite does not fall within the scope of OSHA's marine terminal standard, 29 C.F.R. Part 1917. The Act permits states to enforce occupational safety and health standards under plans approved by the Secretary. *See* 29 U.S.C. § 667. Puerto Rico operates generally under such an approved plan. *See* 29 C.F.R. § 1952.383(s); 47 Fed.Reg. 39,164–66 (1982). As a result, OSHA has enforcement jurisdiction in Puerto Rico only over marine terminals, 29 C.F.R. Part 1917, and in other narrow areas not relevant here. *See* 29 C.F.R. § 1952.382.

The marine terminal standard applies to

employment within a marine terminal as defined in § 1917.2(u), including the loading, unloading, movement or other handling of cargo, ship's stores or gear within the terminal or into or out of any land carrier, holding or consolidation area, or any other activity within and associated with the overall operation and functions of the terminal, such as the use and routine maintenance of facilities and equipment.

29 C.F.R. § 1917.1(a).

"Marine terminal" means

wharves, bulkheads, quays, piers, docks and other berthing locations and adjacent storage or contiguous areas and structures associated with the primary movements of cargo or materials from vessel to shore or shore to vessel including structures which are devoted to receiving, handling, holding, consolidation and loading or delivery of waterborne shipments or passengers, including areas devoted to the maintenance of the terminal or equipment. The term does not include production or manufacturing areas having their own docking facilities and located at a marine terminal nor does the term include storage facilities directly associated with those production or manufacturing areas.

*Id.* § 1917.2(u).

After a hearing, an administrative law judge (the "ALJ") held that Empire's worksite was within the scope of Part 1917 and therefore was within OSHA's enforcement jurisdiction. The ALJ viewed Part 1917 as imposing both a functional test and a geographic test for determining whether the marine terminal standard applies to a given worksite.

The ALJ found the functional test satisfied because Empire engaged in "the ... maintenance of ... equipment" used in maritime cargo handling, and because Empire's sales of diesel fuel to the Ponce Port Authority and LAC were activities "associated with the overall operation and functions of the terminal."

The ALJ found the geographic test satisfied because Empire's operations took place in "contiguous areas ... devoted to the maintenance of the terminal or equipment." He saw no need to look beyond what he characterized by reference to *Webster's Third New International Dictionary* as the plain meaning of "contiguous," which he interpreted as "nearby" or "close" and not limited to immediately or directly adjoining locations. He determined "that the presence of a road, fences, and gate along the wharf is not sufficient to separate out the premises to the north and prevent them from being considered part of a marine terminal." The ALJ also found that neither the Port Authority offices to the west nor the unrelated structures to the east "intrude into or occupy any part of the area to the south between Empire's facility and the wharf itself." Consequently, the Empire worksite was determined to be contiguous with the wharf: "Since there are no intervening work operations or structures unrelated to marine terminal activities, the evidence supports a finding that Empire's property is part of a single, overall facility which comes within the definition of a marine terminal."

Empire filed a petition for review of this decision, and the Commission affirmed but used a different interpretation. Specifically, with respect to the functional test, the Commission found reasonable an administrative interpretation under which "a contiguous area is considered a marine terminal without regard to whether it is associated with the primary movement of cargo or materials from vessel to shore or shore to vessel." With respect to the geographic test, the Commission agreed with the ALJ that "contiguous," as used in § 1917.2(u), can mean

"nearby." The Commission found that, under this definition, Empire's facility qualifies as a contiguous area because it is located approximately one-half mile from the wharf and because "[a]ll of the property between Empire and the wharf is devoted to maritime activities."

Pursuant to 29 U.S.C. § 660, Empire petitioned this Court for review.

## IV. Defining "Marine Terminal"

Empire challenges (A) the Commission's interpretation of the functional test, (B) the Commission's interpretation of the geographic test, and (C) the Commission's application of the geographic test to Empire's worksite.

### A. *The Functional Dimension of "Marine Terminal": Maintenance Associated with Cargo Movement*

■ By holding that a contiguous area is considered a marine terminal without regard to whether it is associated with the primary movement of cargo or materials from vessel to shore or shore to vessel, the Commission all but did away with a functional dimension to the term "marine terminal." Adopting that interpretation, the Commission considered only whether Empire's worksite is contiguous to the Ponce wharf.

We find this aspect of the interpretation articulated by the Commission contrary to the plain language of the regulation. Section 1917.2(u) deals with two basic categories of sites. First are those sites that are *per se* elements of a marine terminal: "wharves, bulkheads, quays, piers, docks and other berthing locations and adjacent storage. . . ." The second category, introduced in § 1917.2(u) by the disjunctive "or," are those "contiguous areas and structures" serving functions "associated with the primary movement of cargo or materials from vessel to shore or shore to vessel . . . including areas devoted to the maintenance of the terminal or equipment." The Commission could have reached its interpretation only by finding that the "associated with" language modifies "structures" but not "contiguous areas." Under the open-textured interpretation adopted by the Commission, *any* contiguous area would qualify as part of a marine termi-nal without apparent regard for its function. If this interpretation were correct, however, it would be supererogatory for the regulation to provide that a marine terminal "includ[es] areas [not limited to structures] devoted to the maintenance of the terminal or equipment." This offends a basic canon of statutory construction requiring every portion of the regulatory language to have meaning. *See Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). Furthermore, by making Part 1917 applicable to contiguous areas without regard to the activities performed therein, the Commission's interpretation cuts the marine terminal standard loose from certain articulated purposes identified by the agency in promulgating its standard. "This proposed rule is a vertical standard, i.e., one which applies to this industry exclusively and is designed specifically to address the hazards associated with marine cargo-handling shore." 46 Fed.Reg. 4182, 4182 (1981).

■ We interpret § 1917.2(u) with emphasis on its functional purpose. We see that purpose to be furthered by finding that Empire's worksite is part of a marine terminal precisely because, as a marine equipment maintenance area, it is associated with the primary movement of cargo or materials. In this connection, Empire contends that the marine terminal standard was not intended to apply to worksites where employees are "merely" engaged in the maintenance and repair of equipment. This argument strains to avoid a practical recognition of just what happens at a marine terminal. The Supreme Court has observed—albeit in the context of the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950—that "maintaining or repairing equipment essential to the loading or unloading process" is not only associated with primary marine activity, but "is an integral part of and essential to those overall processes." *Chesapeake & Ohio Ry. Co. v. Schwalb,* 493 U.S. 40, 47, 110 S.Ct. 381, 385, 107 L.Ed.2d 278 (1989). Furthermore, Empire's suggested definition of a marine terminal permits disregard of one of the important specific goals of the regulation: to prevent injuries suffered during "hot work" (e.g., welding, cutting, heating), which

"is used in the marine terminal principally to perform routine maintenance and repair tasks, such as rebuilding a damaged intermodal container or repairing a chassis that is no longer properly aligned." 46 Fed.Reg. 4182, 4221 (1981). This is activity the ALJ found to be present at Empire's worksite. Most importantly, the regulation itself plainly states that areas covered by virtue of function include those "devoted to the maintenance of the terminal or equipment."

The ALJ found, and Empire does not dispute, that "Empire's business at the location in question is maintenance and repair of equipment used in marine terminal operations." Although the Commission's expansive interpretation avoided any need to review that determination, it is clear to us that this finding of fact is the only one supported by the administrative record. As a result, remand to the Commission would serve no purpose and is therefore inappropriate. *See, e.g., Brock v. L.R. Willson & Sons, Inc.,* 773 F.2d 1377, 1389 n. 12 (D.C.Cir.1985); *Marshall v. Western Elec., Inc.,* 565 F.2d 240, 246 (2d Cir.1977), *overruled on other grounds, Martin v. Occupational Safety & Health Review Comm'n,* 499 U.S. 144, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991).

In sum, while we find the Commission's interpretation of the functional test to be erroneous, we nevertheless conclude that Empire's worksite indisputably satisfies the appropriately tailored functional test applied by the ALJ.

### B. *The Geographic Dimension: "Contiguous" Areas*

■ Empire challenges the interpretation of "contiguous" as including areas "nearby"

but not necessarily "touching." The dictionary definition relied upon by the ALJ and the Commission lists "touching along boundaries" as the primary definition and "nearby" as the tertiary—and therefore less commonly used—meaning.[2] As the Supreme Court has emphasized in an analogous context, an agency's interpretation need not comport with the most common usage:

> To be sure, "terminate" may also bear the meaning proposed by respondent. Indeed, it may bear that meaning more naturally or more frequently in common usage. But it is axiomatic that the EEOC's interpretation of Title VII, for which it has primary enforcement responsibility, need not be the best one by grammatical or any other standards. Rather, the EEOC's interpretation of ambiguous language need only be reasonable to be entitled to deference.

*EEOC v. Commercial Office Prods. Co.,* 486 U.S. 107, 115, 108 S.Ct. 1666, 1671, 100 L.Ed.2d 96 (1988). The language of § 1917.2(u) does not clearly preclude "nearby," and we therefore consider whether the definition adopted by the Commission and the ALJ, regardless of its rank in the dictionaries, is a reasonable interpretation of the term "contiguous" as used in Part 1917.

In promulgating Part 1917, OSHA explained why regulations were needed in certain geographic areas: "The work environment at a marine terminal exposes maritime employees to a greater risk of injury than is true for workers in most other industries." 46 Fed.Reg. 4182, 4183 (1981). Of course, many of the hazards covered by Part 1917 are plainly greatest at the wharves and piers themselves. It is undisputed, however, that Part 1917 applies to some areas distinct from

2. *Webster's Third New International Dictionary* 492 (1986) ("1 ... c: NEARBY, CLOSE: not distant ..."). While purists have been skeptical about the latitudinarian tendencies of Webster's Third, *see generally* Herbert C. Morton, *The Story of Webster's Third: Philip Goves' Controversial Dictionary and its Critics* (1994); *see also* Rex Stout, *Gambit* 2 (1964) (Nero Wolfe reported to view Webster's Third as "subversive because it threatens the integrity of the English language"), this meaning of "contiguous" is found in the primary definition of its more prescriptive predecessor, I *Webster's New International Dictionary* 576 (2d ed. 1950) ("1. In actual contact; touching; also, *near, though not in contact ...*") (emphasis supplied). This meaning is reflected as well as the secondary definition of the current edition of the Random House Dictionary. *Random House Unabridged Dictionary* 439 (2d ed. 1993) ("2. in close proximity without actually touching; near."). The current edition of the principal legal dictionary also treats the definition employed by the Commission and the ALJ as the most common. *Black's Law Dictionary* 320 (6th ed. 1990) ("In close proximity; neighboring ..."). In short, there is nothing unreasonable about defining "contiguous" to mean "nearby."

the docks, so long as related activities are carried out therein. The Secretary has simply determined that, under the regulations, the degree of danger—and thus the need for coverage—in such a distinct area with such defined activities depends upon its proximity to the wharf rather than upon whether the two areas share a common border.

If we were not according substantial deference to the agency interpretation, we might be tempted to read Part 1917 to apply only to those areas immediately adjacent to the wharf itself, because the hazards of direct cargo handling are most likely to be experienced in such areas and because that is a more rigorous definition of "contiguous." *Cf.* Bryan A. Garner, *A Dictionary of Modern Legal Usage* 213 (2d ed. 1995) ("contiguous means, not merely 'close to' or 'near,' but 'adjacent' "). The farther activities are from adjacent areas of direct cargo handling, the more remote are the unique dangers of marine terminals. Presumably at some point beyond adjacent areas employees may appropriately be protected by the ordinary safety standards of a given locality. But these generalizations are speculative, and by contrast we note the ALJ's finding that the actual working activities at Empire's worksite involve the types of hazards addressed by the marine terminal standard—e.g., welding, electrical safety, hazard communications, fall protection, and machine guarding. In any event, the parties have failed to describe the practical significance of the choice between the OSHA and the Puerto Rico safety regimes. In light of the regulation's general protective purposes—and in the absence of some demonstration that an expansive reading presents a practical anomaly—we do not find it unreasonable to interpret Part 1917 as applying to areas "nearby"—and not just to those "touching"—the wharf. *Cf. Texports Stevedore Co. v. Winchester,* 632 F.2d 504, 514 (5th Cir.1980) (holding that areas "adjoining" navigable waters, which are covered by the Longshoremen's and Harbor Workers' Compensation Act, include areas "close to or in the vicinity of navigable waters").

### C.  *Application of the Geographic Test*

■ The Commission's determination of contiguity was based in part upon findings that Empire's worksite and the wharf are separated by an area, about one-half mile long, entirely devoted to maritime activity. This factual predicate was supported by substantial evidence in the record as a whole. Although Empire contends that an "empty lot" lay to the south, directly adjacent to the CHEMEX facility, two OSHA officers testified at the hearing before the ALJ that they had personally observed chassis and containers in this area. Similarly, the maps introduced by both parties in the administrative proceeding, *see supra* note 1 and accompanying text, together with the related testimony, demonstrated, as the ALJ found, that neither the unrelated structures to the east nor the Port Authority offices to the west "intrude into or occupy any part of the area to the south between Empire's facility and the wharf itself."

We also agree with the ALJ that "the presence of a road, fences, and gate along the wharf is not sufficient to separate out the premises to the north and prevent them from being considered part of a marine terminal." Empire makes much of an OSHA guideline emphasizing that federal enforcement jurisdiction ends at "the gate of the terminal." OSHA Instruction STP 2–1.112 (Sept. 9, 1983). However, this phrase appears merely to be a figurative reference to the geographic limits on the scope of Part 1917, and in any event it does not answer the question of where the terminal begins or ends. The marine terminal standard undoubtedly applies to areas distinct from the wharf itself. The existence of intervening roads, fences, and gates between such areas is entirely unremarkable, and such appurtenances do not necessarily reduce the dangers to which the marine terminal standard is addressed.

### V.  Conclusion

We conclude Part 1917 can properly be interpreted to cover maintenance areas "nearby" a wharf, associated with the primary movement of cargo. We further conclude the Commission's finding that Empire's worksite is covered by Part 1917 is in accordance with that interpretation and is supported by substantial evidence in the record as a whole. Accordingly we will not disturb

the Commission's ultimate conclusion that Empire's worksite is a "marine terminal" subject to 29 C.F.R. Part 1917.

*Affirmed.*

MULTI _ PURPOSE AREA

GOVT ADMIN — PORT AUTH

LONG/STEVEDORG — LAC, CHEMEX

MAR TER ACTIVITIES — LAC, EMPIRE,
                     CHEMEX, GEN'L
                     WAREHOUSING

MANUF — OLD TUNA FACTORY
        RONIN BOATYARD

TRUCKG/CARILLO—PRECIS TUNE
WAREHOUSG          AND OTHERS

GAS STORAGE — LIQUILUX

C-2 Booklet

4 LANE PUBLIC ROAD

CHASIS/CONTR STORAGE    EMPIRE    LAC ADMIN

CHASIS SERVICING

TROCKG/WARHSE    RONIN BOATYARD

GATE

PORT AUTHORITY    LAC CHASIS CONTNR STORAGE

LIQUILUX (GAS STORAGE)

OLD TUNA FACTORY

CHEMEX WARSE

GENERAL CARGO WAREHOUSING

GATE    APRON

LAC CONTNR STORAGE    PIER    BERTH

N

0098