## NOTICE:   SLIP OPINION
### (not the court's final written decision)

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| SEATTLE BULK SHIPPING, INC., <br><br>        Appellant, <br><br>    v. <br><br> DEPARTMENT OF LABOR AND INDUSTRIES, <br><br>        Respondent. | No. 83782-6-I <br><br> DIVISION ONE <br><br> PUBLISHED OPINION |

COBURN, J. — This is a Washington Industrial Safety and Health Act (WISHA) case. The Department of Labor and Industries (Department) issued citations for multiple willful, serious, and general violations and penalties against Seattle Bulk Shipping, Inc. (SBS). SBS contends that the Department improperly issued citations under chapter WAC 296-56 because SBS's facility is not a "marine terminal" under WAC 296-56-099. SBS also contends that grain-handling standards under WAC 296-00-005 do not apply because SBS did not store grain. Lastly, SBS argues that the decisions upholding the willful or failure to abate citations should be reversed because the investigating compliance officer did not follow the Department's internal compliance manual. Because the Department improperly cited SBS as a marine terminal, we reverse the violations under chapter WAC 296-56. We otherwise affirm.

Citations and pincites are based on the Westlaw online version of the cited material

FACTS

SBS is a bulk transfer business that leases property from the City of Seattle on Harbor Island. The facility handles transloading commodities, mostly grain and ethanol transfers. Workers transfer grain from railroad cars to shipping containers and from shipping containers to railroad cars using a yard hostler.[1] The transfer is made through the use of a pit, storage towers, and conveyor belts. Workers also transfer ethanol and sometimes diesel fuel from railroad cars to petroleum trucks through connections to a pump with hoses. SBS is responsible for transloading cargo at its facilities for its customers and arranging for truck operators to transport the cargo between the SBS facility and a marine terminal. SBS is not involved in transferring cargo onto or off of a vessel. Port of Seattle terminals are not SBS's clients or customers. SBS's clients are the ones who are responsible for exporting or importing the cargo before or after it passes through SBS's facility. About 90 percent of the cargo SBS handles travels through Terminal 18, which is a few blocks away from SBS's facility.

In December 2014, an SBS employee fell into a grain pit and broke three ribs. After the accident, the Department initiated a safety inspection at SBS, resulting in citation and notice number 317617686 issued in June 2015. The citation alleged 4 willful, 11 serious, and 1 general WISHA violations, and assessed a total penalty of $218,450. The citation included 9 violations under chapter WAC 296-56. This chapter directs employers to "protect employees from hazards associated with marine terminals." WAC 296-56-600.

---

[1] A powered industrial truck used for moving heavy material, such as grain.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

In January 2015, the Department decided it was appropriate for the marine and dock division to also conduct an industrial hygiene inspection. That inspection resulted in a second citation, number 317934962, also issued on June 2015. This citation alleged 2 willful, 2 failure to abate, 30 serious, and 18 general WISHA violations with a total penalty of $206,400. This citation included 5 violations under chapter WAC 296-56.

One serious violation derived from SBS's failure to have an eyewash station on site under WAC 296-800-15030.[2] The Department advised that the deadline for SBS to correct this violation was July 1, 2015. After the abatement deadline passed, SBS requested to stay its abatement pending appeal on August 6. The Board of Industrial Insurance Appeals (Board) denied the request to stay the abatement on September 22 and reminded SBS that it was obligated to correct the violation in accordance with WAC 296-900-150. That rule addresses certifying violation corrections and lists "comply with correction due dates" as an employer responsibility. WAC 296-900-150(3).

The Department was under the impression that SBS had ceased operations, but when the Department learned that SBS had not, the Department conducted a follow-up inspection in January 2016. That citation alleged two serious failure to abate violations and four serious violations resulting in a

---

[2] Specifically, the citation stated the "employer did not provide an emergency eyewash station for employees performing ethanol transfer operations where there is potential for an employee's eyes to be exposed to a strong irritant (ethanol). Strong irritants can cause serious eye injuries."

$448,200 penalty. One failure to abate violation concerned SBS's failure to ensure an approved emergency eyewash onsite under WAC 296-800-15030.

SBS appealed all three citations to the Board. The Board held an administrative hearing, and SBS argued below as it does now on appeal that it did not fall within the WISHA rule's definition of "marine terminal," so it should not have been cited for violations under the marine terminal standard. The Board's industrial appeals judge (IAJ) rejected that argument and issued a proposed decision and order affirming but modifying nearly all of the cited violations and their respective penalties. SBS filed a petition for review from the proposed decision that the Board granted. In January 2021, the Board issued its final decision, rejecting SBS's argument that its facility did not qualify as a marine terminal and affirming a majority of the violations. The Board also rejected the argument and affirmed the citations as modified. In finding of fact 15, the Board found,

> From December 17, 2014, to June 17, 2016, Seattle Bulk
> Shipping's bulk material handling facility on Harbor Island was
> contiguous with wharves, bulkheads, quays, piers, docks, and other
> berthing locations, and it included areas and structures associated
> with the primary movement of cargo or materials from vessel to
> shore or from shore to vessel, and which were devoted to receiving,
> handling, consolidating, and loading or delivery of waterborne
> shipments.

The Board cited to the definition of "marine terminal" under WAC 296-56 and explained,

> SBS provides bulk material transfer services from its facility
> on Harbor Island in Seattle. The facility is in close proximity to
> commercial wharves on Harbor Island although the site does not,
> itself, abut upon Puget Sound or include wharves or berths to which
> ships may tie up. The bulk materials for which transfer services are

4

provided include grains, which arrive by railroad car or in containers
delivered by over-the-road semi-trucks, and ethanol, which arrives
by railroad car.

. . . .

It is clear from the nature of SBS grain transfer operations . .
. that the bulk of SBS business involves import and export of grain,
and the associated onloading and offloading of grain between
railroad cars and ocean containers. Moreover, SBS operates areas
and structures associated with the primary movement of cargo or
materials from vessel to shore or shore to vessel. These operations
occur at [the SBS facility]. Cargos are received, handled, held, and
loaded in these facilities. These activities take place in areas that
are contiguous with the wharves, bulkheads, quays, piers, docks,
and other berthing locations. Although SBS's site does not abut
Puget Sound, it is situated in close proximity to the waterfront and
wharves, bulkheads, quays, piers, docks, and other berthing
locations on Harbor Island. As the term "contiguous" is not, itself,
defined in the rule, it takes its ordinary meaning, which may be
discerned by reference to a dictionary. Dictionary definitions of
"contiguous" include "in close proximity, without actually touching,"
and cite, as an example, the "48 contiguous states." We conclude
that SBS's bulk material transfer activities occur on a marine
terminal, and that Ch. 296-56 WAC applies to those activities.

The Board upheld a total penalty of $410,600.  SBS then appealed to King
County Superior Court, which adopted all of the Board's findings and conclusions
and affirmed.  SBS appeals.

## DISCUSSION

In a WISHA appeal, the court directly reviews the Board's decision based
on the record before that agency.  Shimmick Constr. Co., Inc. v. Dep't of Lab. &
Indus., 12 Wn. App. 2d 770, 778, 460 P.3d 192 (2020) (citing Erection Co. v.
Dep't of Lab. & Indus., 160 Wn. App. 194, 201, 248 P.3d 1085 (2011)).  The
Board's findings of fact are conclusive if they are supported by substantial
evidence. RCW 49.17.150; Shimmick Constr. Co., 12 Wn. App. 2d at 778.

No. 83782-6-I/6

Evidence is substantial if it is sufficient to convince a fair-minded person of the truth of the stated premise. Shimmick Constr. Co., 12 Wn. App. 2d at 778 (citing Mowat Constr. Co. v. Dep't of Lab. & Indus., 148 Wn. App. 920, 925, 201 P.3d 407 (2009)). This court does not reweigh evidence on appeal, but it construes the evidence in the light most favorable to the party that has prevailed in the administrative proceeding—here, the Department. Id. (citing Potelco, Inc. v. Dep't of Lab. & Indus., 194 Wn. App. 428, 434, 377 P.3d 251 (2016); Frank Coluccio Constr. Co. v. Dep't of Lab. & Indus., 181 Wn. App. 25, 35, 329 P.3d 91 (2014).

We review questions of law de novo and interpret agency regulations as if they were statutes. Shimmick Constr. Co., 12 Wn. App. 2d at 778 (citing Wash. Cedar & Supply Co. v. Dep't of Lab. & Indus., 137 Wn. App. 592, 598, 154 P.3d 287 (2007)). We first examine the plain language of the regulation, and if that language is unambiguous, it controls. Silverstreak, Inc. v. Dep't of Lab. & Indus., 159 Wn.2d 868, 881, 154 P.3d 891 (2007). Language is unambiguous if it has only one *reasonable* interpretation. Lopez Demetrio v. Sakuma Bros. Farms, Inc., 183 Wn.2d 649, 655, 355 P.3d 258 (2015) (citing Cerrillo v. Esparza, 158 Wn.2d 194, 201, 142 P.3d 155 (2006)).

We give a high level of deference to an agency's interpretation of its regulations because the agency has expertise and insight gained from administering the regulation that the reviewing court does not possess. Litchfield v. KPMG, LLP, 170 Wn. App. 431, 441 n.26, 285 P.3d 172 (2012) (citing Silverstreak, 159 Wn.2d at 884).

6

No. 83782-6-I/7

Finally, when we interpret WISHA, we may look to federal decisions under the Occupational Safety and Health Act of 1970 (OSHA). Shimmick Constr. Co., 12 Wn. App. 2d at 778 (citing Express Constr. Co. v. Dep't of Lab. & Indus., 151 Wn. App. 589, 599 n.8, 215 P.3d 951 (2009)).

Marine Terminal

As a preliminary matter, the Department contends that SBS waived its argument that SBS is not a "marine terminal."  However, SBS did not waive that argument.  SBS submits that

> [m]any of the violations cited have been pursuant to codes that govern marine terminals and the Board has ignored the situs and status tests.  In this case, the federal law that defines a marine terminal, and whether employees may be construed to work at or for a marine terminal has been ignored.  Not only has the law been ignored, but the related facts have been ignored.  The fact that Seattle Bulk Shipping does not load or unload vessels has been ignored.  The fact that the location of the facility is not adjacent to a functional wharf, pier, berthing location, or dock.  The fact that no employees set foot on a marine terminal, but are in fact removed from the process.  These are all relevant facts to determining if the business is a marine terminal.

The Department argues that SBS failed to cite to the record to support its argument, but SBS is not disputing facts in the record and its argument is based on what is not in the record–evidence of SBS loading or unloading vessels.  This issue was heavily litigated below and SBS has sufficiently maintained its position on appeal for review.

Our legislature passed WISHA in 1973 to ensure worker safety and to supplement the federal OSHA.  Afoa v. Port of Seattle, 176 Wn.2d 460, 470, 296 P.3d 800 (2013) (citing ch. 49.17 RCW; SuperValu, Inc. v. Dep't. of Lab. & Indus., 158 Wn.2d 422, 425, 144 P.3d 1160 (2006)).  WISHA directs the

No. 83782-6-I/8

Department to promulgate regulations that equal or exceed standards

promulgated under OSHA. Afoa, 176 Wn. at 470 (citing RCW 49.17.010, .040).

OSHA's definition of marine terminal is nearly identical to former WAC

296-56-099 (1984). The Department defines "marine terminal" as:

> wharves, bulkheads, quays, piers, docks and other berthing
> locations and adjacent storage or contiguous areas and structures
> associated with the primary movements of cargo or materials from
> vessel to shore or shore to vessel including structures which are
> devoted to receiving, handling, holding, consolidation, and loading
> or delivery of waterborne shipments and passengers, including
> areas devoted to the maintenance of the terminal or equipment.
> The term does not include production or manufacturing areas
> having their own docking facilities and located at a marine terminal
> nor does the term include storage facilities directly associated with
> those production or manufacturing areas.

Former WAC 296-56-099 (1984). OSHA defines "marine terminal" as:

> wharves, bulkheads, quays, piers, docks and other berthing
> locations and adjacent storage or adjacent areas and structures
> associated with the primary movement of cargo or materials from
> vessel to shore or shore to vessel including structures which are
> devoted to receiving, handling, holding, consolidating and loading
> or delivery of waterborne shipments or passengers, including areas
> devoted to the maintenance of the terminal or equipment. The term
> does not include production or manufacturing areas nor does the
> term include storage facilities directly associated with those
> production or manufacturing areas.

C.F.R. § 1917.2.

While no Washington court has previously interpreted the definition of

"marine terminal" under former WAC 296-56-099, at least one federal court

addressed a similar issue to the one before us now. Empire Co., Inc. v.

Occupational Safety & Health Rev. Comm'n, 136 F.3d 873 (1st Cir. 1998).

In Empire, the court analyzed whether an employer was considered a

marine terminal under OSHA's former version of the definition, which was

8

identical to former WAC 296-56-099.  Empire Co., 136 F.3d at 876 (analyzing former C.F.R. § 1917.1(u) (1996)).

Empire operated a worksite that engaged in the maintenance, repair, and rental of equipment such as marine shipping containers and lifts to move heavy loads and chassis upon which containers are placed for ground transportation. Empire Co., 136 F.3d at 875.  The maritime industry provided about 80 percent of Empire's rental business and 85 percent of its maintenance and repair business.  Id.  Empire also supplied diesel fuel to a stevedoring company and to the local port authority, which operated a wharf and berth facility for the handling of maritime cargo.  Id.  The worksite was approximately one-half mile north of the port authority's wharves, and the area between the worksite and the shore was entirely devoted to maritime activity.  Id.  Empire contended that its worksite was outside of OSHA's enforcement jurisdiction because Empire's worksite did not fall within the scope of OSHA's marine terminal standard.  Id. at 874-75.

In the court's analysis of OSHA's definition of "marine terminal," it concluded it reached two categories of worksites.  The first are sites that are per se elements of a marine terminal, including "'wharves, bulkheads, quays, piers, docks, and other berthing locations and adjacent storage . . . .'"  Id. at 877 (citing Former C.F.R. § 1917.2(u)). The second category are those "'contiguous areas and structures' serving functions 'associated with the primary movement of cargo or materials from vessel to shore or shore to vessel . . .  including areas devoted to the maintenance of the terminal or equipment.'"  Id. (alteration in original) (citing Former C.F.R. § 1917.2(u)).

9

No. 83782-6-I/10

The Empire court rejected the Occupational Safety and Health Review Commission's interpretation "that a contiguous area is considered a marine terminal without regard to whether it is associated with the primary movement of cargo or materials *from vessel to shore or shore to vessel*." Empire, 136 F.3d at 877 (emphasis added). By doing so "all but did away with a functional dimension to the term "'marine terminal.'" Id. The court reasoned that by making the definition "applicable to contiguous areas without regard to the activities performed therein, the Commission's interpretation cuts the marine terminal standard loose from certain articulated purposes identified by the agency in promulgating its standard. 'This proposed rule is a vertical standard, i.e., one which applies to this industry exclusively and is designed specifically to address the hazards associated with marine cargo-handling shore.'" Id. (quoting 46 Fed. Reg. 4182, 4182 (1981)).

Instead, the court interpreted the definition "with emphasis on its functional purpose." Id. The court noted that the United States Supreme Court observed, though in a different context, that "'maintaining or repairing equipment essential to the loading or unloading process' is not only associated with primary marine activity, but 'is an integral part of and essential to those overall processes.'" Id. (quoting Chesapeake & Ohio Ry. Co. v. Schwalb, 493 U.S. 40, 47, 110 S. Ct. 381, 385, 107 L. Ed. 2d 278 (1989)). The Empire court noted that the administrative law judge found, and Empire did not dispute, that "Empire's business at the location in question is maintenance and repair of equipment used in marine terminal operations." Id. at 878. The court noted that "the regulation

10

No. 83782-6-I/11

itself plainly states that the areas covered by virtue of function include those 'devoted to the maintenance of the terminal or equipment.'" Id.

In the court's analysis of the geographic test determining whether Empire met the "contiguous" requirement, it concluded that it was not unreasonable to interpret the definition to reach areas "nearby" and not just those "touching" the wharf, but noted that the "farther activities are from adjacent areas of direct cargo handling, the more remote are the unique dangers of marine terminals." Id. at 879. The court found the "contiguous" test met because of a finding, and supporting evidence, that Empire's worksite and the wharf were only separated by an area about one-half mile long. The court reasoned that the presence of a road, fences, and a gate along the wharf were not sufficient to separate out Empire's worksite and prevent it from being considered part of a marine terminal. Id. at 879.

In Empire, the main function of Empire's business was not just its use of shipping containers—the key to its functionality was that its business involved *maintenance and repair* of equipment used in *marine terminal operations* and the worksite was within a half mile of the wharf. Those circumstances are unlike the circumstances in the instant case.

Though the Board found that SBS's "areas and structures associated with the primary movement of cargo or materials from vessel to shore or from shore to vessel," the evidence does not support this finding. The Board also found that the bulk material for which SBS provides transfer services arrive by railroad car or in containers delivered by yard hostlers. Even though the court found that the

11

areas were "devoted to receiving, handling, consolidating, and loading or delivery of waterborne shipments," these are not areas "devoted to the maintenance of the terminal or equipment" as defined in the former WAC 296-56-099.

The evidence does not support that SBS's areas or structures were associated with "the primary movement of cargo or material *from vessel to shore or from shore to vessel*." At most, SBS's areas and structure were associated with the primary movement of cargo from inland to shore and shore to inland. SBS's functionality is not performing maintenance on shipping containers or equipment for a marine terminal. SBS's functionality is participating in the supply chain of distributing a commodity that happens to be exported and imported. If that was sufficient to qualify as a marine terminal, then any business that happens to load or unload a commodity to or from a shipping container on a truck or train also would be a marine terminal as long as they were within close proximity to a wharf, bulkhead, quays, piers, docks and other berthing locations. Indeed, at oral argument, the Department conceded as much and maintained that such businesses could also be considered marine terminals. Wash. Court of Appeals oral argument, *Seattle Bulk Shipping, Inc. v. Dep't of Lab. & Indus.*, No. 83782-6-I (Jan. 26, 2023), at 17 min., 17 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://www.tvw.org/watch/?clientID=9375922947&eventID=2023011365.

However, we start with the plain language of the definition of "marine terminal." The contiguous areas and structures must be associated with the "primary movements of cargo or materials from *vessel to shore or shore to*

12

No. 83782-6-I/13

*vessel.*" Former WAC 296-56-099 (1984) (emphasis added). By the statute's own plain language, it does not extend to activities along the supply chain whose primary movements of cargo and materials are from shore to inland or inland to shore and nothing to do with vessel to shore or shore to vessel. While we give a high level of deference to an agency's interpretation of its regulations, the regulation defining a marine terminal is not vague requiring interpretation. The Department's wish to extend the reach of chapter WAC 296-56 all but does away with the functional aspect of the term "marine terminal."

Substantial evidence does not support the Board's finding of fact 15, and therefore the finding does not support the Board's conclusion that the SBS worksite met the plain language definition of a marine terminal. Accordingly, we reverse the Board's decision with respect to the corresponding violations affirmed under chapter WAC 296-56.[3]

### Grain Handling

SBS next contends that the Board should not have applied grain handling standards to its business. We disagree.

---

[3] Because we reverse the citations under chapter WAC 296.56, we need not consider SBS's additional argument that the Longshore and Harbor Workers Compensation Act of 1927 (LHWCA), 33 U.S.C. §§ 901-950 preempts WAC 296-56.

SBS also argues that the SBS facility is "not adjacent to a functional wharf, pier, berthing location, or dock." The Board found that the SBS facility was "contiguous" to wharves, bulkheads, quays, piers, docks and other berthing locations. SBS fails to make any argument as to whether its facility satisfied the "contiguous" requirement under former WAC 296-56-099. "We will not consider an inadequately briefed argument." Norcon Builders, LLC v. GMP Homes VG, LLC, 161 Wn. App. 474, 486, 254 P.3d 835 (2011).

SBS asserts that there are no structures where SBS stored grain, claiming, without citing to the record, that "[u]nrefuted testimony showed that grain was never stored at the facility."

The Board affirmed multiple violations against SBS regarding the grain handling rules under WAC 296-99.

The grain handling rules apply to:

- Dry grinding operations of soycake;
- Dry corn mills;
- Dust pelletizing plants;
- Feed mills;
- Flour mills;
- Flat storage structures;
- Grain elevators;
- Rice mills; and
- Soybean flaking operations.

WAC 296-99-015(1).[4]  A "flat storage structure" is a "grain storage structure" that:

- Cannot empty by gravity alone;
- Can be entered through an opening at ground level; and
- Must be entered to remove leftover grain.

WAC 296-99-005.[5]  A "grain elevator" is a "facility in which bulk raw grains are stored by means of elevating machinery for later shipment." Id.

The Board made multiple findings regarding the structures at SBS and concluded that they fell under the grain handling standard. It found that the SBS facility stored grain, and that the pit "cannot be emptied by gravity alone, can be

---

[4] We cite to the current version of the WAC because the relevant subsection is identical to the applicable former WAC 296-99-015(1) (1984).

[5] We cite to the current version of the WAC because the language is identical to the applicable former WAC 296-99-020 (1997).

14

entered through an opening at ground level, and must be entered to clean and remove leftover grain.  The Board also found that "[t]he Normal Grain Operation consists of a tower into which grain is transferred from railroad cars by means of a conveyor system, and in which the grain is stored for later transfer . . ."  And it concluded that at the time of inspection, the pit was a grain structure within the meaning of WAC 296-99.

Substantial evidence supports the Board's findings that SBS stored grain at its Harbor Island facility.  One inspector testified that during a site visit he saw a grain elevator and storage structure.  Another inspector testified that the grain railcars open from the bottom, dropping the grain into the pits where the grain is then moved by a conveyer into a storage silo on the property. A conveyer moves the grain from the silo into shipping containers.  SBS does not cite to anything in the record to support its contention that grain was not stored in the silo structure.

We determine, construing the evidence in the light most favorable to the Department, that there was substantial evidence to support the Board's finding, which supports its conclusion that the grain handling standard applies to SBS's business operations.

<u>Willful Violations</u>

SBS next contends that the Department failed to satisfy the willful violation standard.  We disagree.

The Board determined SBS committed five willful violations.

Willful violations carry enhanced penalties because of the "particularly improper 'state of mind' with which the standard is violated."  <u>Elder Demolition,</u>

15

Inc. v. Dep't of Lab. & Indus., 149 Wn. App. 799, 808, 207 P.3d 453 (2009) (internal quotation marks omitted) (quoting Nat'l Steel & Shipbuilding Co. v. Occupational Safety & Health Review Comm'n, 607 F.2d 311, 315 (9th Cir. 1979)). However, an employer does not need to harbor malicious motives or possess a specific intent to commit a willful violation. Id. "Instead, a plain indifference to safety requirements is sufficient by itself to establish a willful violation." Id.

SBS does not argue that the willful violation findings are not supported by substantial evidence. Instead, SBS argues that the Department's internal compliance manual provides that compliance officers "must normally obtain written statements. . . [w]hen there is a potential repeated or willful violation." Additionally, the procedure for written statements should normally be written in the first person and in the words of the individual interviewed, and the statement must be read to the individual and an attempt made to obtain agreement. SBS claims the Department did not attempt to procure a signed written statement from any SBS personnel, and that based on the failure to follow its policy, the Board should have found the Department's evidence insufficient to prove willful violations.

SBS does not even attempt to show that the inspector's actions prejudiced SBS as to the violations it challenges. SBS cites to no authority to support that noncompliance with an internal policy requires reversal. Where no authorities are cited in support of a proposition, we are not required to search out authorities, but may assume that counsel, after a diligent search, has found

16

none. DeHeer v. Seattle Post-Intelligencer, 60 Wn.2d 122, 126, 372 P.2d 193 (1962). The compliance manual is not binding law. It is an internal set of guidelines for the Department to follow. The manual itself states that "[t]he contents of this manual are not enforceable by any person or entity against the Department of Labor and Industries. . ." We find this argument unpersuasive.

### Failure to Abate

SBS contends that substantial evidence did not support the Board's conclusion that SBS failed to abate its violations. We disagree.

In the second citation and notice number 31793462 issued in June 2015, SBS was cited for failing to have an eyewash station, noting a deadline to abate of July 1, 2015. After the abatement deadline passed, SBS requested to stay its abatement pending appeal on August 6. On September 22, the Board denied the request to stay and instructed SBS that it was obligated to correct the violation in accordance with WAC 296-900-150,[6] which further instructed the employer to comply with correction due dates.

SBS cites to the Department's compliance manual, which provides that "[w]hen a stay request is denied at the Board, the DOSH appeals staff will notify the employer of the required abatement date." SBS does not cite to RCW 49.17.140(5)(f) which provides that an employer's abatement obligation is stayed "[a]s long as a motion to stay abatement is pending." Even if it could be argued that SBS assumed its requirement to abate was stayed while its motion to stay

---

[6] We cite to the current version of the WAC because the language is identical to the applicable former WAC 296-900-150 (2013).

17

was pending, SBS learned near the end of September that the stay was denied and was instructed to correct the violation and comply with correction due dates. Knowing that SBS had already missed the July 1 deadline before even requesting a stay, it should have understood that it was required to install the approved emergency eyewash onsite as soon as possible if SBS continued to operate. Regardless, it was not until January 2016 that the Department, after realizing that SBS was still in operation, returned for another inspection and discovered the absence of an approved emergency eyewash onsite. Under these circumstances, we find that substantial evidence supports the Board's conclusion that SBS failed to abate its violation related to the eyewash onsite. Because SBS fails to cite to the record or make any argument as to other failure to abate violations, we do not consider those assignments of error. RAP 10.3(a)(6); Cowiche, 118 Wn.2d at 809 (argument unsupported by reference to the record or citation to authority will not be considered).

CONCLUSION

We reverse the superior court and the Board's decision with respect to the corresponding violations affirmed under chapter WAC 296-56 and remand to vacate those violations and recalculate the penalties owed under the remaining violations. We otherwise affirm.

_Coburn, J._

WE CONCUR:

_Dwyer, J._

18